IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NATIONAL FEDERATION OF　　　　*
THE BLIND, INC., *et al.*,
　　　　　　　　　　　　　　　*
　　　　Plaintiffs,
　　　　　　　　　　　　　　　*
　　　　v.
　　　　　　　　　　　　　　　*　　　Civil Action No. RDB-18-3301
WAL-MART ASSOCIATES, INC.,
　　　　　　　　　　　　　　　*
　　　　Defendant.
　　　　　　　　　　　　　　　*

*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*

## MEMORANDUM OPINION

This case addresses the scope of a national retailer's obligations under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, to assist visually impaired customers with a modern self-checkout service. Plaintiffs Cynthia Morales, Linwood Boyd, and Melissa Sheeder (collectively, the "Individual Plaintiffs"), supported by the National Federation of the Blind and the National Federation of the Blind of Maryland (collectively, the "Federations"), claim that self-checkout kiosks operated by Defendant Wal-Mart Associates, Inc. ("Walmart") violate the ADA by "exclud[ing] blind people from using the service in the way that it was intended—independently and privately." (Pls.' Mem. Supp. Summ. J. 2, ECF No. 95-1.) Plaintiffs seek a nationwide injunction that would direct Walmart to make these kiosks "accessible from start to finish" by implementing modern tactile and sound-based controls. (Def.'s Mem. Supp. Summ. J. 5–7, ECF No. 87.) These changes are not required by the text of the ADA or the Design Standards promulgated by the Department of Justice, and neither party could identify any retailers that use this technology nationwide.

Pending now are competing Motions for Summary Judgment filed by both parties. (Def.'s Mot. Summ. J., ECF No. 87; Pls.' Mot. Summ. J., ECF No. 95.) The parties do not dispute any material facts, and focus their arguments exclusively on whether the Plaintiffs have standing to pursue their ADA claims, and whether the ADA entitles them to relief as a matter of law. (*See* Def.'s Repl. 3, ECF No. 106; Pls.' Repl. 6, ECF No. 113) These summary judgment motions were consolidated, and a hearing was held on September 24, 2021. (ECF No. 122.) For the following reasons, Walmart's Motion for Summary Judgment (ECF No. 87) is hereby GRANTED, and Judgment shall be ENTERED in its favor. Plaintiffs' Motion for Summary Judgment (ECF No. 95) is hereby DENIED.

## BACKGROUND

### I.    Walmart's Self-Checkout Kiosks

Walmart is a retail corporation that owns and operates thousands of stores nationwide. (Pls.' Mem. Supp. 3.) As of January 2020, Walmart ran a total of 3,571 Supercenters, 376 Discount Stores, and 809 Neighborhood Markets around the continental United States and Puerto Rico. (Def.'s Ans. to Pl. L. Boyd's Req. for Admis. 2, ECF No. 95-3). At a growing number of establishments, Walmart allows customers to purchase items using self-service kiosks. (Pls.' Mem. Supp. 3.) These kiosks include several hardware components, such as an interactive touchscreen, a handheld scanner, a cash machine, and a scanner scale. (*Id.* at 4–5; Dep. of R. Crozier. 36:18–37:13, 37:18–38:11, ECF Nos. 87-1, 95-4.) The kiosks are also accompanied by a "tactile numeric keypad," where customers may privately input their financial information. (C. Earl Expert Report, Jun. 17, 2021, at 6–7, ECF Nos. 87-12, 95-21; Interacting with Associates and Customers who are Visually Impaired ("Associate Assistance

Guidelines"), ECF No. 106-2.) The Plaintiffs have acknowledged in their submissions to this Court and at the hearing on September 24, 2021 that these tactile keypads adequately protect this financial information.

Walmart appoints its associates to serve as "self-checkout hosts" and assist customers with self-checkout if help is requested. (Def.'s Mem. Supp. 3; Crozier Dep. 24:4–11, 34:14–37:16, 82:21–83:14; Dep. of K. Graham 83:1–18, ECF Nos. 87-2, 95-7.). These associates handle several tasks, such as "zoning the area, arranging and organizing merchandise and supplies, . . . loss prevention through monitoring checkouts . . . , processing customer transactions by operating register equipment, assisting with scanning items for customers, assisting customers with self-checkout, and assisting customers with questions and register prompts." (Def.'s Mem. Supp. 3; Job Description, Self-Checkout Attendant, ECF No. 106-1) Walmart requires associates to help blind customers complete the self-checkout process, and specifically directs them to allow blind customers to access the tactile keypads privately in order to enter their financial information. (Crozier Dep. 25:20–26:6, 34:13–35:13, 41:10–43:2, 82:14–20; Associate Assistance Policy.)

## II.    Plaintiffs' Difficulties with Self-Checkout

The National Federation of the Blind advocates for "full participation in society in terms of equality" for the visually impaired. (Pls.' Mem. Supp. 7, 19–20; Dep. of M. Riccobono 35:13–22, ECF Nos. 87-8, 95-14.) Its state affiliate, the National Federation of the Blind of Maryland, works in the State of Maryland "to strengthen the law about public accommodation and discrimination." (Pls.' Mem. Supp. 7; Dep. of S. Maneki 69:4-10, ECF Nos. 87-9, 95-15.) Plaintiffs Morales, Boyd, and Sheeder are visually-impaired Maryland residents, members of

both Federations, and frequent Walmart shoppers. (*See* Maneki Dep. 60:21–61:3; Riccobono Dep. 35:13–22; Dep. of C. Morales 21:9–23:10, 57:17–58:15, ECF Nos. 87-3, 95-10; Dep. of L. Boyd 27:2–9, 30:2–12; ECF Nos. 87-4, 95-11; Dep. of M. Sheeder 34:1–19, ECF No. 87-6, 95-12.) Each of the Individual Plaintiffs proffer harm while attempting to complete the self-checkout process, in that they would like to be able to use Walmart's kiosks without assistance from sighted individuals. (*See* Pl. M. Sheeder's Ans. to Def.'s Second Set of Interrogs. No. 20, ECF No. 87-7; Morales Dep. 62:19–22; Boyd Dep. 36:5–38:1.)

In July 2018, Plaintiff Sheeder visited the Walmart in Glen Burnie, Maryland with a visually-impaired friend. (Sheeder Dep. 34:16-19; 39:3-14.) As this trip was a "spur of the moment" occasion, Sheeder did not call customer service to arrange for associate assistance. (*Id.* 36:8-12.) When they arrived at the store, Sheeder and her friend went to customer service to ask for assistance, but were told that "there would be a little bit of a wait." (*Id.* 36:13-20.) With the assistance of her friend, the "Seeing AI" app on her cellphone, and several people on the floor, Sheeder managed to navigate the store, locate all of her items, and begin the self-checkout process. (*Id.* 36:21–37:5, 37:18–39:2.) After struggling to scan some of her items, Sheeder's friend asked a nearby employee to assist them. (*Id.* 41:5–21.) Instead of helping them check out, the self-checkout host cancelled their transaction, helped them put their merchandise back in the cart, and directed them to a cashier lane. (*Id.* 41:16–42:11.)

On January 30, 2017, Plaintiffs Morales and Boyd visited the Walmart store in Ownings Mills, Maryland. (Pl. C. Morales Ans. to Def.'s Second Set of Interrogs. No 19, ECF No. 95-13.) An associate assigned by customer service helped them locate items, accompanied them to the self-checkout area, and helped them scan their purchases. (Boyd Dep. 20:1–21:13.)

4

When they completed their transaction with the employee's assistance, the automated kiosk declared: "don't forget your cash." (Morales Dep. 73:12–19.) Upon examining their receipt, Morales and Boyd realized that the Walmart associate assigned to help them had stolen $40 using the kiosk's cash-back feature. (*Id.* 73:18–19; Boyd Dep. 21:14–18.) They promptly notified a manager and called the police. (Boyd Dep. 22:2–23:19; Morales Dep. 20:9-13, 62:7-17.) Walmart refunded the stolen money and terminated the offending employee. (Boyd Dep. 23:10–19; Morales Dep.. 20:5–8)

### III.   Litigation by the National Federation of the Blind

Plaintiffs filed their initial Complaint on October 25, 2018, and the operative Amended Complaint on November 27, 2018. (Compl., ECF No. 2; Am. Compl., ECF No. 9.) In their Amended Complaint, Plaintiffs seek a nationwide injunction directing Walmart to implement upgraded kiosks featuring "screen access software and tactile guides and controls routinely used in other types of self-service kiosks to provide nonvisual access to information relayed on the screen and to allow for an accessible method of inputting selections." (Am Compl. ¶¶ 33–41; Maneki Dep. 51:4–18l; Riccobono Dep. 48:14–49:5, 55:1–13.) Among other items, Plaintiffs request a tactile keypad, a headphone jack, text-to-speech output, Braille labels, and upgrades to the kiosks' text and graphics. (Pls.' Mem. Supp. 34–35.) Plaintiffs demand that Defendant "begin placing accessible kiosks into stores within 180 days and complete the task within 3 years." (*Id.*)

Walmart filed a Motion to Dismiss the Amended Complaint (ECF No. 12), and this Court denied that motion. (ECF No. 25.) Discovery commenced pursuant to a Scheduling Order entered on October 3, 2019 (ECF No. 27), which was modified several times between

October 2019 and April 2021 as a result of delays caused by the COVID-19 pandemic. (*See generally* ECF Nos. 29, 34, 46, 54, 66, 77, 80.) Over the course of this lengthy discovery timeline, the parties deposed several witnesses, issued multiple interrogatories, and produced two experts to testify regarding the accessibility of Walmart's self-checkout kiosks. Following the conclusion of discovery, Defendant filed the pending Motion for Summary Judgment on July 23, 2021. (ECF No. 87). The Plaintiffs filed their Response in Opposition and Cross-Motion for Summary Judgment on August 13, 2021. (ECF No. 95). The parties have submitted consolidated Replies to each of these motions. (ECF Nos. 105, 113). Both motions are now ripe for review.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine dispute over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and

defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences "in the light most favorable to the nonmoving party." *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). This Court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that a trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the factfinder to resolve factual disputes, including issues of witness credibility. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866–68 (2014).

When both parties file motions for summary judgment, as here, this Court applies the same standard of review to both motions, considering "'each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Defenders of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (quoting *Bacon v. City of Richmond*, 475 F.3d 633, 638 (4th Cir. 2007)). "[B]y the filing of a motion [for summary judgment,] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Brown v. Perez*, 835 F.3d 1223, 1230 n.3 (10th Cir. 2016) (citation omitted); *see also Sherwood v. Washington Post*, 871 F.2d 1144, 1148 n.4 (D.C. Cir. 1989) ("[N]either party waives the right to a full trial on the merits by filing its own motion."). "However, when cross-motions for summary judgment demonstrate a basic agreement

concerning what legal theories and material facts are dispositive, they 'may be probative of the non-existence of a factual dispute." *Syncrude Canada Ltd. v. Highland Consulting Grp., Inc.*, 916 F. Supp. 2d 620, 624 (D. Md. 2013) (quoting *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983)); *Ge. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015).

## ANALYSIS

Neither party claims that there are disputed issues of material fact. Instead, the parties focus their arguments entirely on issues of law, rendering this case ripe for summary judgment. *See, e.g.*, *Ge. State Conf. of NAACP*, 775 F.3d at 1345 ("[I]f 'both parties proceed on the same legal theory and rely on the same material facts . . . the case is ripe for summary judgment."). In its Motion for Summary Judgment, Walmart insists that none of the Plaintiffs have standing to assert their ADA claims, and argues that those claims fail on the merits, as Walmart has satisfied its duty to provide effective communication and nothing in the ADA requires Walmart to implement independently accessible self-checkout kiosks. (Def.'s Mem. Supp. 2; Def.'s Repl. 5, 19.) In their Cross-Motion for Summary Judgment, Plaintiffs insist that all five Plaintiffs have standing under Article III, and that they are entitled to the nationwide injunctive relief they request as a matter of law. (Pls.' Mem. Supp. 10, 23; Pls.' Repl. 1.) For the following reasons, Walmart's Motion for Summary Judgment is hereby GRANTED.

## I.   Article III Standing

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. Art. III, § 2. "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III" that gives meaning to

these constitutional limits by "'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). The "irreducible constitutional minimum" of Article III standing requires a plaintiff to "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc., v. Robins*, 578 U.S. 330, 136 S. Ct. 1540, 1547 (2016). Plaintiffs bear burden of establishing standing, as they are "the party seeking to invoke federal jurisdiction." *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002) (quoting *Lujan*, 504 U.S. at 561).

In cases involving multiple plaintiffs, "the Supreme Court has made it clear that 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (quoting *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)); *accord Town of Chester, N.Y. v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650–51 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint."). Accordingly, only one plaintiff must have standing to survive Defendant's Motion for Summary Judgment. *See, e.g.*, *Know Your IX v. DeVos*, No. RDB-20-01224, 2020 WL 6150935, at *1 (D. Md. Oct. 20, 2020); *Am. Coll. of Obstetricians & Gynecologists v. U.S. Food & Drug Admin.*, 472 F. Supp. 3d 183, 198–99 (D. Md. July 13, 2020). Here, the Individual Plaintiffs have standing under a traditional analysis. The Federations lack

organizational standing to sue in their own right, but may assert associational standing to sue on the Individual Plaintiffs' behalf.[1]

### A. Individual Plaintiffs

Walmart alleges that none of the Individual Plaintiffs have suffered an injury-in-fact that can provide a predicate for an injunction under the ADA. To demonstrate an injury-in-fact, a plaintiff must show "an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) actual or imminent." *Lujan*, 504 U.S. at 560–61 (citations omitted); *Griffin v. Dep't of Lab. Fed. Credit Union*, 912 F.3d 649, 653 (4th Cir. 2019).[2] A party seeking injunctive relief must also show "'a real or immediate threat' that the party will suffer an injury in the future." *Griffin*, 912 F.3d at 655 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111

---

[1] Although the Plaintiffs have standing to sue, their standing to seek a nationwide injunction is questionable at best. The Supreme Court has held that "a plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (citation omitted), and thus "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth v. Laidlaw Envt'l. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). As the United States Court of Appeals for the Sixth Circuit recently noted in *Association of American Physicians & Surgeons v. United States Food and Drug Administration*, ___ F.4th ___, No. 20-1784, 2021 WL 4097325 (6th Cir. 2021):

> Associational standing is in tension with these Article III redressability rules because it creates an inherent mismatch between the plaintiff and the remedy. The association, by definition, has not suffered the injury. Its members have. To satisfy Article III's redressability requirement, then, the injunctive relief in an associational-standing case must benefit (and ameliorate an injury to) the association's members.

2021 WL 4097325, at *6. These principles suggest that the Federations may only seek relief in locations where their members have been harmed. *See Equal Rights Center v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510, 527–28 (D. Md. 2010) (confining scope of associational standing in ADA case to locations where members of plaintiff organization had actually "encounter[ed] barriers" and stores they had been "deterred from patronizing"); *accord Colo. Cross Disability Coalition v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1212–13 (10th Cir. 2014). Nevertheless, it is unnecessary to rule on this issue, as Plaintiffs' claim fails on the merits.

[2] "An injury is 'concrete' when it is 'real and not abstract.'" *Griffin*, 912 F.3d at 653 (quoting *Spokeo*, 136 S. Ct. at 1548). "For an injury to be particularized, it must affect the plaintiff in a way that is 'individual'" and "not 'common to all members of the public.'" *Id.* at 654–55 (citing *Lujan*, 504 U.S. at 560 n.1; *United States v. Richardson*, 418 U.S. 166, 177 (1974)). To be "imminent," a future injury "must be 'certainly impending,'" requiring a "substantial risk that the harm will occur." *Id.* at 655; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

(1983)). "This burden is not particularly demanding in ADA cases." *Williams v. Potomac Fam. Dining Grp. Operating Co., LLC*, Case No. GJH-19-1780, 2019 WL 5309628, at \*2 (D. Md. Oct. 21, 2019). Consistent with almost every circuit to address this issue, the United States Court of Appeals for the Fourth Circuit has held that "when an ADA plaintiff has alleged a past injury at a particular location, his plausible intentions to thereafter return to that location are sufficient to demonstrate the likelihood of future injury." *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 455 (4th Cir. 2017); *Daniels v. Arcade, L.P.*, 477 F. App'x 125, 129–31 (4th Cir. 2012).[3]

This standard does not require plaintiffs to articulate "concrete, specific plans to return to the locus of the injury." *Nanni*, 878 F.3d at 451; *Daniels*, 477 Fed. App'x at 130. In *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447 (4th Cir. 2017), and *Daniels v. Arcade, L.P.*, 477 F. App'x 125 (4th Cir. 2012), mobility-impaired plaintiffs alleged that public marketplaces were designed with accessibility barriers that made it difficult for wheelchair-bound customers to navigate. 878 F.3d at 455; 477 Fed. App'x at 127. This Court dismissed each case on standing grounds, holding that the plaintiffs had failed to show "more than a mere possibility of future harm." *Nanni v. Aberdeen Marketplace, Inc.*, No. CV WMN-15-2570, 2016 WL 2347932, at \*3 (D. Md. May 4, 2016), *vacated*, 878 F.3d 447 (4th Cir. 2017); *Judy v. Arcade L.P.*, No. CIV.A. RDB 10-607, 2011 WL 345867, at \*6 (D. Md. Feb. 2, 2011), *vacated sub nom. Daniels v. Arcade, L.P.*, 477

---

[3] *See, e.g.*, *Camarillo v. Carrols Corp.*, 518 F.3d 153, 158 (2d Cir. 2008); *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 580 (6th Cir. 2014); *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1074 (7th Cir. 2013); *Steger v. Franco, Inc.*, 228 F.3d 889, 892–93 (8th Cir. 2000); *Tandy v. Wichita*, 380 F.3d 1277, 1284 (10th Cir. 2004); *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1336–37 (11th Cir. 2013). Two circuits have gone further, holding that a plaintiff's "actual knowledge of illegal barriers at a public accommodation" is sufficient to confer standing once a plaintiff has been injured, even if the plaintiff does not intend to return. *Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133, 1135 (9th Cir. 2002); *Dudley v. Hannaford Bros.*, 333 F.3d 299, 306–07 (1st Cir. 2003) ("Congress clearly meant not to overburden Title III claimants.").

F. App'x 125 (4th Cir. 2012). In both cases, the Fourth Circuit reversed, holding that the "denial of equal access" to each market's services was a "concrete, particularized, and actual" injury under the ADA. *Nanni*, 878 F.3d at 455–56; *Daniels*, 477 F. App'x at 129. Each plaintiff had also established a "real and immediate threat" that he would face the same accessibility barriers in the future: In *Daniels*, the plaintiff lived near the market, had visited the market before, and intended to visit the market again. 477 F. App'x at 129–30. In *Nanni*, although the plaintiff lived further away, he visited the market "several times a year" on trips from his home in Delaware to Baltimore or Washington, D.C. 878 F.3d at 456.

Applying the principle articulated in *Nanni* and *Daniels*, the Individual Plaintiffs have established an injury-in-fact sufficient to confer standing under Article III. Plaintiffs claim that the accessibility barriers in Walmart's self-checkout kiosks denied them "the opportunity to participate in self-checkout service in a manner that is equal to . . . sighted customers," and left them vulnerable to theft and mistreatment when they attempted to use the service in 2017. (Pls.' Mem. Supp. 11, 13; Pls.' Repl. 2; Sheeder Dep. 41:1–21; Boyd Dep. 19:18–23:19; Morales Dep. 46:9–19, 62:19–63:1.) Plaintiffs also testified at deposition that they regularly shop at Walmart, that they would like to use the self-checkout kiosks, and that they are deterred from doing so by knowledge of the kiosks' inaccessible design. (Sheeder Dep. 34:1–19 94:9–16; Morales Dep. 21:9–23:10; 62:19–63:1, 87:1–13; Boyd Dep. 27:2–9, 37:14–38:1, 47:2–11.) These attestations are sufficient to demonstrate a past injury and a plausible intent to return. Accordingly, Plaintiffs are entitled to seek injunctive relief under the ADA.[4]

---

[4] Boyd does not have standing, as his injury is not particularized. The record demonstrates that Boyd has not attempted to use the self-checkout machines himself, and that he was, at best, a bystander to Morales' transaction. (Boyd Dep. 13:5–11.) As Boyd was not affected "individually," he cannot establish standing based

Walmart makes three attempts to undermine this conclusion. Each argument fails. First, Walmart argues *Nanni* and *Daniels* addressed claims involving inaccessible architecture, and are inapplicable to this case, which turns primarily on a public accommodation's obligation to provide auxiliary aids and services. (Def.'s Repl. 21.) However, the Fourth Circuit has construed *Nanni* and *Daniels* broadly: In *Griffin v. Department of Labor Federal Credit Union*, 912 F.3d 649 (4th Cir. 2019), the Fourth Circuit applied *Nanni* to evaluate a blind plaintiff's claim that a website contained several accessibility barriers that made it difficult to use without assistance. 912 F.3d at 653, 655–56. Although the Fourth Circuit denied standing, *Griffin* demonstrates that the rubric provided by *Nanni* and *Daniels* governs injury-in-fact in ADA claims generally—not merely in cases involving architectural barriers. *See also Mejico v. Alba Web Designs, LLC*, 515 F. Supp. 3d 424, 430–31 (W.D. Va. 2021) (same).

Second, Walmart claims that the Individual Plaintiffs cannot show a continuing injury or a likelihood of future harm, as they have not attempted to use self-checkout since 2017. (Def.'s Mem. Supp. 27–29.) This argument contradicts the ADA's guarantee that a disabled plaintiff is not required "to engage in a futile gesture" in order to establish discrimination and preserve their right to seek injunctive relief. 42 U.S.C. § 12188(a)(1). Thus, "the existence of a private right of action under [Title III] does not depend upon how many attempts a plaintiff has made to overcome a discriminatory barrier, but, rather, upon whether the barrier remains

---

on a generalized grievance regarding alleged accessibility barriers in Walmart's kiosks. *Griffin*, 912 F.3d at 653 ("For an injury to be particularized, it must affect the plaintiff in a way that is 'individual', [rather than] 'common to all members of the public.'" (citations omitted)). Additionally, prudential considerations may preclude him from litigating based exclusively on injuries suffered by his fellow plaintiffs. *See United States v. Windsor*, 570 U.S. 744, 757, 760 (2013); *Singleton v. Wulff*, 428 U.S. 106, 113 (1976). Nevertheless, as Boyd's co-plaintiffs have standing, he may remain a party to this lawsuit. *Bostic*, 760 F.3d at 370.

in place." *Dudley*, 333 F.3d at 305; *accord Pickern*, 293 F.3d at 1138 ("[A] disabled individual who is currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA has suffered 'actual injury.'"). Under *Nanni* and *Daniels*, Plaintiffs are not required to show "concrete, specific plans to return to the locus of the injury"—it is enough that they have encountered the self-check kiosks once and plausibly intend to return in the future. *Nanni*, 878 F.3d at 451, 455.

Finally, Walmart cites three decisions out of the Southern District of New York for the proposition that "one isolated incident" is not sufficient to establish a violation of Title III.[5] (Def.'s Mem. Supp. 28–29; Def.'s Repl. 19–21.) *See Stephens v. Shuttle Assocs., L.L.C.*, 547 F. Supp. 2d 269, 278 (S.D.N.Y. 2008); *Moe's West v. Moe's Franchisor, LLC*, No. 15-cv-2846, 2015 WL 8484567, at *4 (S.D.N.Y. Dec. 9, 2015); *West v. Five Guys Enterprises, LLC*, No. 15-cv-2845, 2016 WL 482981, at *2 (S.D.N.Y. Feb. 5, 2016). This argument conflates the Article III standing requirements with the merits of Plaintiffs' claim.[6] In *West v. Five Guys Enterprises, LLC*, No. 15-wicv-2845, 2016 WL 482981 (S.D.N.Y. Feb. 5, 2016), the court found that two blind plaintiffs had standing to allege that they were unable to independently use a self-service soda

---

[5] This argument also speaks to the causation element. To confer standing, an alleged injury "has to be fairly . . . traceable to the challenged action of the defendant" rather than "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (citing *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)) (alterations omitted). At the summary judgment hearing, Walmart argued that Plaintiffs' injuries are attributable to employees not before the court, rather than Walmart's self-checkout kiosks. (ECF No. 122.) This misstates the relevant injury. Plaintiffs claim they are denied an equal opportunity to use Walmart's self-checkout service due to their disabilities—they do not seek to recover damages for past injuries, such as the theft of Morales' $40, or the delays Sheeder had to endure when she was refused assistance. (Am. Compl. ¶ 41; Pls.' Mem. Supp. 3, 34.) This "denial of opportunity" is readily attributable to Walmart.

[6] None of the cases Walmart cites ruled on standing grounds. Although the defendant in *West v. Moe's Franchisor, LLC*, No. 15-cv-2846, 2015 WL 8484567 (S.D.N.Y. Dec. 9, 2015), raised a standing challenge, the Southern District of New York did not address that issue in any capacity, resolving the case exclusively on the merits. *See* 2015 WL 8484567, at *12 ("Plaintiffs do not state a claim under the ADA.").

machine, even if "the ADA does not entitle [them] to relief under these facts." 2016 WL 482981, at **1, 2 n.1; *accord Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, n.4 (2014). So too here: The Individual Plaintiffs have stated an injury in fact sufficient to confer standing under Article III, regardless of the outcome on the merits.

### B. Organizational Plaintiffs

Walmart also alleges that the National Federation of the Blind and the National Federation of the Blind of Maryland cannot litigate individually, or on their members' behalf. "Associations can allege standing based upon two distinct theories." *Maryland Highways Contractors Ass'n, Inc. v. State of Md.*, 933 F.2d 1246, 1250 (4th Cir. 1991); *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadland, LLC*, 713 F.3d 175, 182 (4th Cir. 2013). Organizational standing "permits a group to allege standing on its own behalf for injuries directly inflicted on the organization," requiring a traditional analysis of Article III principles. *Equal Rts. Ctr. v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510, 518 (D. Md. 2010) (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)); *accord Southern Walk*, 713 F.3d at 182. Comparatively, associational standing "enables an organization to sue as a representative of its members who have been harmed." *Abercrombie*, 767 F. Supp. 2d at 518. The Federations invoke both theories.

The Federations assert organizational standing "to sue for the harm that the respective organizations have endured by virtue of this time-consuming, resource-intensive, and expensive litigation." (Pls.' Mem. Supp. 16.) To evaluate organizational standing, "'a court conducts the same inquiry as in the case of an individual.'" *People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Md., Inc.*, 843 F. App'x 493, 495 (4th Cir. 2021) (quoting *Md. Highways Contractors Ass'n*, 933 F.2d at 1250). Although an organization "'may suffer an

injury in fact when a defendant's actions impede its efforts to carry out its mission,'" an association "'that seek[s] to do no more than vindicate [its] own value preferences through the judicial process' cannot establish standing." *PETA*, 843 F. App'x at 495 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1972); *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012)). Here, the Federations claim to have "expended time and effort in this litigation to ensure that the blind have an equal opportunity to participate in emerging technology in commerce," such as by interviewing members, reaching out to Walmart, and raising the issue at chapter meetings. (Pls.' Mem. Supp. 19–20.) This injury, stemming exclusively from "the costs associated with the instant lawsuit," *PETA*, 843 F. App'x at 497, is little more than an attempt to "vindicate [NFB's] value preferences through the judicial process," and is insufficient to confer standing. *See Sierra Club*, 405 U.S. at 739.

The Federations also invoke associational standing to sue on behalf of the Individual Plaintiffs. (Pls.' Mem. Supp. 16.) An organization asserting associational standing must show that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *accord Laidlaw*, 528 U.S. at 181. To satisfy the first prong of this analysis, "an organization suing as representative [must] include at least one member with standing." *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996).[7] The third element is met so long as "the nature of the claim

---

[7] At the summary judgment hearing held on September 24, 2021, Walmart referenced *Equal Rights Center v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510 (D. Md. 2010), for the proposition that the Federations lack associational standing unless they can show that all of their unnamed members would have standing to sue

and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause." *Warth*, 422 U.S. at 511. "The Supreme Court has repeatedly held that requests by an association for declaratory and injunctive relief do not require participation by individual association members." *Hosp. Council of W. Pa. v. Pittsburgh*, 949 F.2d 83, 89 (3d Cir. 1991) (citing *Pennell v. City of San Jose*, 485 U.S. 1, 7 n.3 (1988); *Int'l Union, United Auto., Aerospace & Agr. Implement Workers v. Brock*, 477 U.S. 274, 287–88 (1986)).

These elements are satisfied here. First, the parties concur that the Individual Plaintiffs are members of both Federations. (Pls.' Mem. Supp. 7; Def.'s Mem. Supp. 30; Riccobono Dep. 35:13–22.) As discussed above, at least two of the Individual Plaintiffs have standing to sue in their own right. Second, an ADA claim seeking to correct accessibility barriers on behalf of the blind is undeniably germane to the Federations' mission of helping the visually impaired achieve "full participation in society in terms of equality." (Pls.' Mem. Supp. 17; Riccobono Dep. 35:13–22, 37:14–20, 75:19–76:1; Maneki Dep. 62:21–63:1, 69:4–10.) Third, as the Plaintiffs seek "injunctive relief, the type of relief for which associational standing was originally recognized," *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 187 (4th Cir. 2007), the participation of individual Federation members is not "indispensable" in this case. *Warth*, 422 U.S. at 511. (Pls.' Mem. Supp. 2, 16.) Accordingly, the Federations have standing pursue this case on behalf of the Individual Plaintiffs.

---

individually. (ECF No. 122.) This is incorrect as a matter of law. As this Court observed in *Abercrombie*, "[t]he Supreme Court has explained that to satisfy the first element of the *Hunt* test, 'an organization suing as representative [must] include at least one member with standing.'" 767 F. Supp. 2d at 518 (citing *United Food*, 571 U.S. at 555); *accord Piney Run Pres. Ass'n v. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 262 (4th Cir 2001) ("An association, as the representative of its members who have been harmed, possesses standing to sue if it can show . . . at least one member would otherwise have individual standing."). The injuries suffered by NFB's unnamed members are relevant to the scope of relief available in this case, but do not undercut their standing to assert an ADA claim.

Walmart counters that the prudential restriction on third party standing precludes this lawsuit. (Def.'s Mem. Supp. 29–30.) Certain prudential considerations may deprive a party of standing "even when Article III permits the exercise of jurisdiction." *Windsor*, 570 U.S. at 760. Chief among them, "a litigant will ordinarily not be permitted to assert the rights of absent third parties." *Flast v. Cohen*, 392 U.S. 83, 99 n.20 (1968); *accord Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 214–15 (4th Cir. 2002) (outlining exception to this principle). Even assuming prudential considerations apply to ADA claims,[8] the presumption against third party standing has no effect on associational standing, which by definition "permits an entity to sue over injuries suffered by its members even when . . . the entity itself alleges no personal injury." *Ass'n of Am. Physicians & Surgeons*, ___ F.4th ___, 2021 WL 4097325, at *3; *United Food*, 517 U.S. at 557 ("[T]he entire doctrine of 'representational standing' . . . rests on the premise that in certain circumstances, particular relationships . . . are sufficient to rebut the background presumption . . . that litigants may not assert the rights of absent third parties.") Accordingly, Walmart's attempt to invoke prudential standing fails as a matter of law.

## II.    Title III of the Americans with Disabilities Act

Title III of the Americans with Disabilities Act provides that: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). "To prevail under Title III of the ADA, a plaintiff

---

[8] There is no consensus that prudential considerations apply to claims under Title III of the ADA. *Compare Abercrombie*, 767 F. Supp. 2d at 522 ("Congress has not evinced an intention to eliminate prudential limitations on standing to assert claims under Title III of the ADA."), *with Equal Rts. Ctr. v. Avalonbay Communities, Inc.*, No. AW-05-2626, 2009 WL 1153397, at *7–8 (D. Md. Mar. 23, 2009) ("The legislative history and purpose of the ADA are inconsistent with the application of prudential standing limitations to claims under Title III.").

must show that: (1) he is disabled within the meaning of the ADA; (2) the defendant owns, leases, or operates a place of public accommodation; and (3) the defendant discriminated against him because of his disability." *J.D. ex rel. Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 669–70 (4th Cir. 2019). Neither party disputes that the Individual Plaintiffs are disabled, and that Walmart is a place of public accommodation. The only contested element is whether Walmart has discriminated against the Individual Plaintiffs and the Foundation members on the basis of their disabilities.

The outcome of a Title III claim "depends on [the] proper construction of the term 'discrimination'" in the context of the case. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 681–82 (2001). Plaintiffs insist Walmart's kiosks violate three applicable nondiscrimination provisions: (1) its obligation to design facilities that are "readily accessible" to individuals with disabilities; (2) its responsibility to provide "auxiliary aids and services" to its visually impaired customers; and (3) its general duty to ensure that blind customers receive "full and equal enjoyment" of its goods and services. (Pls.' Mem. Supp. 29.) Walmart counters that the "auxiliary aids and services" provision exclusively controls, and that its decision to provide associates as "qualified readers" satisfies its ADA obligations. (Def.'s Mem. Supp. 11–13.) For the reasons that follow, Walmart prevails on all three issues.

A. <u>Accessible Design</u>

First, the parties dispute whether Walmart's kiosks comply with the ADA's provisions governing accessible design. (Am. Compl. ¶¶ 29–30.) The ADA defines "discrimination" to include "a failure to design and construct facilities for first occupancy . . . that are readily accessible to and usable by individuals with disabilities," and "a failure to make alterations in

such a manner that . . . the altered portions of the facility are readily accessible to and usable

by individuals with disabilities." 42 U.S.C. §§ 12183(a)(1)-(2). Implementing regulations define

"facility" to include, as relevant, "any portion of buildings, structures, sites, complexes, [and]

equipment." 28 C.F.R. § 36.104. Whether a facility is "readily accessible" is determined

exclusively by reference to Design Standards promulgated by the Department of Justice. 42

U.S.C. § 12183(a)(1); 28 C.F.R. pt. 36, App. A. Accordingly, full compliance with the Design

Standards has been held to satisfy 42 U.S.C. § 12183, and the absence of an applicable Design

Standard will defeat a claim under this provision. *See, e.g.*, *Kohler v. Bed, Bath & Beyond of Cali.,*

*LLC*, 778 F.3d 827, 832–33 (9th Cir. 2015); *Colo. Cross Disability Coal.*, 765 F.3d at 1221

("[O]therwise, an entity's decision to follow the standards and build an 'accessible' facility

would have little meaning.").

To demonstrate that Walmart's kiosks are not accessible to blind customers, Plaintiffs

introduce expert testimony by Crista Earl, the Principal Accessibility Consultant for Tech for

All, Inc. (C. Earl Expert Report 42). Analogizing design standards promulgated by the United

States Access Board for accessible airport kiosks and ATMs, Ms. Earl identifies "numerous

accessibility and usability issues" in the kiosks. (*Id.* at 3–4.) Specifically, Ms. Earl observes that

"the primary user interface can only be operated via a touch screen," the text on screen is "too

small for users with low vision to see it without difficulty," and the kiosk offers no "speech

output" or "tactilely discernible input controls" for the blind. (*Id.* at 10–17.) Ms. Earl concludes

that the issues she highlighted can be adequately addressed through the specific hardware and

software changes Plaintiffs now request. (*Id.* at 5.) Walmart counters these conclusions with

two expert reports from William Hecker, an architect with experience in the field of accessible

design, who contends that the standards relied on by Ms. Earl are inapplicable.[9] (W. Hecker's Second Rebuttal Report, Jul. 15, 2021, at 25–27, ECF Nos. 87-14, 95-23; W. Hecker's First Rebuttal Report, at 14–18, ECF No. 95-22.)

Whatever the merit of these experts' testimony, Plaintiffs' argument is unavailing, as the latest edition of the Design Standards expressly excludes self-checkout kiosks of this nature. The Advisory to Section 707 of the 2010 Design Standards, which governs ATMs and fare machines, provides that "[i]nteractive transaction machines (ITMs), other than ATMs, are not covered by Section 707." U.S. Dep't of Justice, 2010 ADA Standards for Accessible Design § 707 (2010), https://www.ada.gov/regs2010/2010ADAStandards/2010ADAStandards.pdf. Here, as in *Kohler*, the absence of an applicable Design Standard demonstrates that Defendant is in full compliance with 42 U.S.C. § 12183, and forecloses an accessible design claim under this provision.[10] A contrary ruling would require this Court to rewrite the Design Standards to fill a void that Congress and the Department of Justice left empty, and "render compliance with these regulations meaningless." *Colo. Cross Disability Coal.*, 765 F.3d at 1221

---

[9] Plaintiffs have separately filed a Motion to Strike Defendant's Expert Designation of William Hecker, Jr. and to Preclude his Deposition Testimony and Reports, arguing that his testimony contains only bare legal conclusions. (ECF No. 97.) Although expert testimony "that merely states a legal conclusion" may be properly excluded under Rule 702, *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002), both parties' experts have rendered legal opinions regarding the applicable legal standard to evaluate the accessibility of Walmart's kiosks. As both parties have cited Plaintiffs' expert report, it is in the interest of fairness to allow Defendant's rebuttal. Additionally, as this Court will not be relying on Mr. Hecker's reports in order to resolve the pending motions for summary judgment, this motion is now moot. Accordingly, Plaintiff's Motion to Strike Defendant's Expert Designation of William Hecker, Jr. and to Preclude his Deposition Testimony and Reports (ECF No. 97) is hereby DENIED.

[10] Of course, the absence of an applicable Design Standard and the inapplicability of 42 U.S.C. § 12183 does not mean that Walmart's kiosks are exempt from other Title III provisions. The Department of Justice has taken the position that "where there is no relevant ADA regulation applicable to turn to, ADA's general nondiscrimination provisions apply." Statement of Interest of the United States of America, *Ronald Migyanko v. Aimbridge Hospitality, LLC*, Case 2:20-cv-01095 (W. D. Pa. June 8, 2021) (ECF Nos. 95-34; 57); *accord* Statement of Interest of the United States, *New v. Lucky Brand Dungarees Stores, Inc.*, No. 14-CV-20574, 2014 WL 1868858 (S.D. Fla. 2021). To the extent that this is accurate, Plaintiffs' claim must be addressed under those provisions.

(citation omitted); *accord Moe's Franchisor*, 2015 WL 8484567, *3 ("[G]iven the labyrinth of city, state, and federal regulations, it is not appropriate for this Court to announce new ones."). Accordingly, Plaintiffs must look to other provisions in the ADA to establish their claim.

　　　B.　Auxiliary Aids and Services

　　Plaintiffs also assert that Walmart's use of store associates as "qualified readers" fails to satisfy its obligation to provide "auxiliary aids and services" to visually impaired customers. (Am. Compl. ¶ 33.). As relevant, the ADA defines discrimination to include:

> [A] failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

42 U.S.C. § 12182(b)(2)(A)(iii). Examples of appropriate aids for the visually impaired include, as relevant: (1) "qualified readers," (2) "accessible electronic and information technology," and (3) the "[a]cquisition or modification of equipment or devices." 28 C.F.R. § 36.303(b)(2), (3). "Qualified reader means a person who is able to read effectively, accurately, and impartially using any necessary specialized vocabulary." *Id.* § 35.104.

　　Title III and its implementing regulations require public accommodations to furnish "appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). "[T]he type of auxiliary aid that ensures 'effective communication' varies by context." *Feldman v. Pro. Football, Inc.*, 419 F. App'x 381, 391 (4th Cir. 2011). Public accommodations are instructed to consider: "[(1)] the method of communication used by the [disabled] individual; [(2)] the nature, length, and complexity of the communication involved; and [(3)] the context in which the communication is taking

place." 28 C.F.R. § 36.303(c)(1)(ii). "[T]o be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." *Id.*

Nevertheless, the regulations "do not require the auxiliary aids and services to take a particular form," as long as they provide effective communication. *Feldman*, 419 F. App'x at 392. To the contrary, "the ultimate decisions as to what measures to take rests with the public accommodation." 28 C.F.R. § 36.303(c)(1)(ii). As the implementing regulations note:

> The auxiliary aid requirement is a flexible one. A public accommodation can choose among various alternatives as long as the result is effective communication. For example, a restaurant would not be required to provide menus in Braille for patrons who are blind, if the waiters in the restaurant are made available to read the menu.

*Id.* pt. 36, App. C.

Staff assistance is sufficient to provide effective communication in a retail transaction. In *West v. Moe's Franchisor, LLC*, No. 15-cv-2846, 2015 WL 8484567 (S.D.N.Y. 2015), two blind plaintiffs brought Title III claims against a nationwide restaurant chain, alleging that the defendant's self-service soda machines lacked "adaptive features, such as a screen reader with audio description[s] or tactile buttons" that would allow blind customers "to use them independently." 2015 WL 8484567, at *1. The plaintiffs argued that Moe's use of employees as "qualified readers" was insufficient to preserve "the privacy and independence" of blind customers. *Id.* at *3. The court rejected this argument, observing that "ADA regulations make clear that restaurants are permitted to use qualified readers to assist visually-impaired patrons with menu selections," and that "[n]othing in the ADA or its implementing regulations" requires Moe's to "alter its Freestyle machines in a way that allows blind individuals to retrieve

beverages without assistance." *Id.*; *see West v. Five Guys Enterprises, LLC*, No. 15-cv-2845, 2016 WL 482981, at *1 (S.D.N.Y. Feb. 5, 2016) ("Although the ADA does not necessarily require Five Guys to use technology that allows Plaintiffs to operate the machine independently, Five Guys must effectively communicate with Plaintiffs such that they can enjoy the Freestyle machine.").

Comparatively, in circumstances with heightened expectations of privacy, assistance from a qualified reader may not be sufficient. In *National Federation of the Blind v. Lamone*, No. RDB-14-1631, 2014 WL 4388342 (D. Md. Sept. 4, 2014), *aff'd* 813 F.3d 494 (4th Cir. 2016), this Court found that Maryland failed to satisfy parallel provisions under Title II of the ADA[11] when it elected to provide certified individuals to help blind voters cast absentee ballots, rather than using an online tool that would allow them to vote "privately and independently." 2014 WL 4388342, at *15. Observing that "Maryland allows any voter to vote by absentee ballot," and that "courts now generally recognize that a denial of private and independent voting constitutes a denial of meaningful access" to the electoral process, this Court reasoned that requiring disabled citizens to rely on third-party assistance deprived them of "equal access to that precise benefit." *Id.* at **11–12; *accord Disabled in Action v. Bd. of Elections*, 752 F.3d 189, 198 (2d Cir. 2014) (holding that participation in a voting program "includes the option to cast a private ballot on election days"); *Cali. Council of the Blind v. Cnty. of Alameda*, 985 F. Supp. 2d

---

[11] Title II governs discrimination by public entities. 42 U.S.C. § 12131. The regulations implementing Title II include an "auxiliary aids and services" requirement that roughly parrots the provision under Title III. *See* 28 C.F.R. § 35.160(b)(1) (requiring public entities to furnish "appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity"); § 35.160(b)(2) (mandating that auxiliary aids must be provided "in a timely manner, and in such a way to protect the privacy and independence of the individual with a disability").

1229, 1238 (N. D. Cal. 2013) ("[O]ne of the central features of voting, and one of its benefits, is voting privately and independently. . . . [M]ost voters at the polls cast their ballots in private, without threat of interference by poll workers, the government, or curious onlookers.").

This case falls within the ambit of *Moe's* and *Five Guys*, and is distinguishable from *Lamone*, *Disabled in Action*, and *California Council of the Blind*. Under the ADA, Walmart has an obligation to provide auxiliary aids that guarantee effective communication in its self-checkout process. Walmart has fulfilled this obligation by appointing associates to serve as "qualified readers" and providing guidelines and policies that instruct them to assist visually-impaired customers. (*See* Associate Assistance Policy.) As the court observed in *Moe's*, this is enough to guarantee effective communication. Although blind patrons may prefer an independently accessible kiosk, (Pls.' Mem. Supp. 26), Walmart has the final authority to "choose among various alternatives, as long as the result is effective communication." 28 C.F.R. pt. 36, App. C ("Congress did not intend under Title III to [require public accommodations to] give primary consideration to the request of the individual with a disability."). Even if the "adaptive features" Plaintiffs demand are technically and financially feasible,[12] "[n]othing in the ADA or its implementing regulations" requires Walmart to implement them when alternative services can achieve effective communication. *Moe's Franchisor*, 2015 WL 8484567, at *3. As the court

---

[12] The feasibility of these changes is unclear at best. While Plaintiffs' expert asserts that these changes are feasible, and Walmart's representative Ryan Crozier said in a deposition that "if [Walmart] wanted to install these, . . . we could," while noting that the development of this technology would be "a major undertaking." (Crozier Dep. 94:1–12.), NFB's representative Mark Riccobono acknowledged that he is not "aware of any retailers . . . that have self-checkout kiosks with the features [NFB is seeking]." (Riccobono Dep. 61:11–15.) Nevertheless, this issue is unnecessary to the resolution of this case, and need not be addressed. *Cf. Libertarian Party of Va.*, 718 F.3d at 313 (defining a material fact as one which "might affect the outcome of the suit under the governing law").

observed in *Moe's*, "effective assistance from . . . employees acting as 'qualified readers' is sufficient." *Id.* at *3.

Plaintiffs counter that Walmart's auxiliary aid fails to preserve the "privacy and independence" of the visually impaired. (Pls.' Mem. Supp. 26–29.) This argument is unavailing. Unlike voting, which has been presumptively private and independent for decades, there is ordinarily no expectation of privacy in a public retail transaction. *E.g.*, *Maryland v. Macon*, 472 U.S. 463, 469 (1985); *Moe's Franchisor*, 2015 WL 8484567, at *3; *Ball v. Wal-Mart, Inc.*, 102 F. Supp. 2d 44, 50–51 (D. Mass. 2000) ("Common sense tells us that the act of shopping in a store involves exposure of the person and the items they purchase."). The only inherently private action involved in self-checkout is the entry of a consumer's financial information, such as a debit card PIN. *See* Statement of Interest of the United States, *New v. Lucky Brand Dungarees Stores, Inc.*, No. 14-CV-20574, 2014 WL 1868858 (S.D. Fla. 2021) (ECF No. 87-16) ("Inherent in [point of sale] transactions are customer concerns about the confidentiality and security of private financial information.").[13] However, Walmart's policies instruct associates to direct blind customers to tactile keypads where they can enter this information privately, (Associate Assistance Policy), and both parties acknowledge that the tactile keypads attached to Walmart's kiosks adequately protect this information. (Def.'s Repl. 10.) Accordingly, Plaintiffs' claim under the auxiliary aids and services provision fails as a matter of law.

C.  Full and Equal Enjoyment

---

[13] In their depositions and at the summary judgment hearing, Plaintiffs argued that there could be privacy concerns associated with buying certain items, such as feminine hygiene products. (*See, e.g.*, Sheeder Dep. 51:4–22.) However, these privacy concerns are no more present for visually impaired customers than sighted customers, who regularly expose their purchases to the public while shopping in a retail establishment. *See Ball*, 102 F. Supp. 2d at 50–51.

Finally, Plaintiffs argue that Walmart's choice of auxiliary aid, even if sufficient under 42 U.S.C. § 12182(b)(2)(iii), violates the ADA's general provisions by denying them an "equal opportunity to use and enjoy the benefits of the self-checkout service." (Pls.' Mem. Supp. 23, 25; Am. Compl. ¶ 32.) The ADA provides disabled individuals a right to be free from discrimination "in the full and equal enjoyment" of places of public accommodation. 42 U.S.C. § 12182(a). Consistent with this guarantee, the ADA broadly defines discrimination to include: (i) denying a disabled individual the opportunity to "participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity;" and (ii) offering a disabled individual "the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals." 42 U.S.C. §§ 12182(b)(1)(A)(i)-(ii).

As an initial matter, Walmart argues that this provision should not apply, and that this case should be analyzed exclusively under the "auxiliary aids and services" requirements. (Def.'s Mem. Supp. 13.) At least on the regulatory level, DOJ has provided that "[t]he specific provisions, including the limitations on those provisions, control over the general provisions in circumstances where both specific and general provisions apply." 28 C.F.R. § 36.213. Nevertheless, the guarantee of "full and equal enjoyment" under and the other generalized nondiscrimination provisions are required by the text of the ADA. *See* 42 U.S.C. §§ 12182(a), (b)(1). While DOJ may dictate the proper interpretation of its implementing regulations, DOJ cannot narrow the construction of the statute. Moreover, courts routinely construe the ADA's "auxiliary aids and services" provision in light of the guarantee of "full and equal enjoyment." *See, e.g.*, *Feldman*, 419 Fed. App'x at 390; *Argenyi v. Creighton Univ.*, 703 F.3d 441, 490 (8th Cir.

2013) (requiring defendant to adopt auxiliary aids that afford disabled individuals "equal opportunity to gain the same benefit"); *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012) (reasoning that the ADA "guarantees the disabled more than mere access to public facilities; it guarantees them 'full and equal enjoyment'").

"What constitutes 'full and equal enjoyment' of a place of public accommodation's goods, services, facilities, and privileges necessarily varies based on what the place provides to visitors and consumers." *Feldman*, 419 F. App'x at 391. In *Feldman v. Pro. Football, Inc.*, 579 F. Supp. 2d 697 (D. Md. 2008), *aff'd* 419 F. App'x 381 (4th Cir. 2011), this Court ordered the operators of FedEx Field, home of Washington D.C.'s professional football team, to implement auxiliary aids that would provide deaf spectators access to "music with lyrics, play information, advertisements, referee calls, safety/emergency information, and other announcements." 579 F. Supp. 2d at 709. Defendants appealed, challenging this Court's determination "that the ADA requires them to furnish plaintiffs with access to the lyrics to music that is played over the public address system." *Feldman*, 419 F. App'x at 386, 390–91. The Fourth Circuit affirmed, reasoning that access to music broadcast during games was necessary for deaf spectators to "fully and equally experience the planned and synchronized promotional entertainment that large stadiums like FedEx Field provide." *Id.* at 391–92. Nevertheless, observing that "'full and equal enjoyment' is not so capacious as to 'mean that an individual with a disability must achieve an identical result or level of achievement as persons without a disability,'" and that the auxiliary aid provision is flexible, the Fourth Circuit declined to "require the auxiliary aids and services to take a particular form." *Id.* at 392 (citing 28 C.F.R. pt. 36 App. C).

Plaintiffs insist that an auxiliary aid that does not allow blind customers to check out without assistance "transforms the nature of Walmart's self-checkout service," depriving them of its key benefits in violation of the ADA. (Pls.' Mem. Supp. 29). Plaintiffs emphasize "that sighted customers can use Walmart's self-checkout kiosks independently—from scanning, to bagging, to payment—with no required assistance from a Walmart associate," and point out that Walmart highlights speed and flexibility as core benefits of the self-checkout process. (Pls.' Repl. 10–11; SCO: Attracting customers to use Self Check Out, ECF Nos. 95-5, 113-1.) Plaintiffs insist that Walmart's use of associate assistance does not allow blind customers to "take advantage of the convenience, shorter lines, and speed of the self-checkout kiosks as sighted Walmart customers can." (Pl. L. Boyd's Ans. to Def.'s Second Set of Interrogs., No. 21, ECF No. 87-17.) "End-to-end employee assistance . . . is more akin to a traditional cashier lane than an autonomous customer checkout option." (Pls.' Mem. Supp. 2.)

This argument addresses form, not content. In *Feldman*, the Fourth Circuit addressed the content that must be communicated through auxiliary aids to provide disabled patrons "full and equal enjoyment" of a defendant's services—and declined to require auxiliary aids in a specific form. 419 F. App'x at 392. Here, the parties do not dispute what information Walmart must communicate in order to provide "full and equal enjoyment" of its self-checkout service—only what form of auxiliary aid Walmart is required to provide. But "the law does not dictate what auxiliary services must be provided." *Feldman*, 579 F. Supp. 2d at 710. Consistent with *Feldman*, this Court declines to divest Walmart of its flexibility "to choose among various alternatives" in deciding how to provide effective communication to the visually impaired. 28 C.F.R. pt. 36 App. C.

Plaintiffs argue that other auxiliary aids would be more timely, more efficient, and more independent. (*See, e.g.*, Pls.' Mem. Supp. 28.) However, as the Fourth Circuit observed in the *Feldman* case, DOJ regulations provide that:

> Full and equal enjoyment means the right to participate and to have an equal opportunity to obtain the same results as others to the extent possible with such accommodations as may be required by the Act and these regulations. It does not mean that an individual with a disability must achieve an identical result or level of achievement as persons without a disability.

28 C.F.R. pt. 36 App. C; *accord Feldman*, 419 F. App'x at 392; *Argenyi*, 703 F.3d at 448. Accordingly, Walmart is only required to provide visually-impaired patrons "equal opportunity . . . to the extent possible" during the self-checkout process. It is not required to guarantee that blind customers will achieve "an identical result."

"Equal opportunity" is what precisely what Walmart provides by instructing associates to communicate all necessary information for blind customers to complete their transactions. Plaintiffs' goal of absolute independence is not achievable: The Individual Plaintiffs all rely on associates to move about the store, (*see* Morales Dep. 22:22–23:5; Boyd Dep. 28:1–9; Sheeder Dep. 26:18–28:7), and Plaintiffs' expert acknowledges that associate assistance would be necessary at the self-checkout kiosks even if all of the technical changes she recommends are ultimately implemented. (Def.'s Mem. Supp. 8, Dep. of C. Earl 84:3–12, ECF No. 87-11.) This arrangement also approximates the self-checkout experience enjoyed by sighted customers: As Walmart representative Ryan Crozier noted in his deposition, "all customers eventually will have to need associate assistance in some capacity," as issues often arise in point-of-sale transactions. (Crozier Dep. 34:14–36:3.) Accordingly, Walmart's decision to employ its store associates as "qualified readers" provides visually impaired customers "equal opportunity to

obtain the same results as others to the extent possible," and Plaintiffs' argument under the "full and equal enjoyment" provision fails as a matter of law.

## CONCLUSION

For the foregoing reasons, Walmart's Motion for Summary Judgment (ECF No. 87) is hereby GRANTED, and Judgment is entered in its favor. Plaintiffs' Cross-Motion for Summary Judgment (ECF No. 95) is concurrently DENIED.

A separate order follows.

Date: October 12, 2021

Richard D. Bennett
United States District Judge